J-S19017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3044 EDA 2018 |

Appeal from the Order Entered, September 19, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-AP-0000470-2017.

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3045 EDA 2018 |

Appeal from the Order Entered, September 19, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-DP-1000097-2016.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STRASSBURGER*, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 30, 2019**

_____
*   Retired Senior Judge assigned to the Superior Court.

In this matter, L.J. (Father) appeals the order terminating his parental rights to a nearly 3-year-old daughter N.M.J., pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2) and (b).[1]  After review, we affirm.

Child came to the attention of the Philadelphia Department of Human Services (DHS) when Mother and Child tested positive for marijuana and cocaine during Child's birth in October 2015.  Father also abused cocaine and marijuana.  Consequently, the juvenile court removed Child from her parents' care and placed her in the home of a maternal cousin.

The juvenile court adjudicated Child dependent in July 2016.  As a part of his Single Case Plan, the court ordered Father to: seek drug treatment; participate in random drug screens; visit Child; obtain appropriate housing; and complete a parenting program.  Father never complied with the court-sanctioned reunification plan during the course of the dependency proceedings.

In April 2017, DHS filed a petition to terminate Father's rights.  The orphans' court conducted a termination hearing on September 19, 2018.[2]

---

[1] The court also terminated parental rights of B.M.P. (Mother).  Although her appeal is before this panel, it is not consolidated with this matter. **See** 3087 EDA 2018; 3093 EDA 2018.

[2] We note that the Child was properly represented under 23 Pa.C.S.A. § 2313(a).  At the beginning of the termination hearing, Child's guardian *ad litem* advised the court that Child, who was nearly three years old, was pre-verbal and too young to articulate a preferred outcome. **See In re T.S.**, 192 A.3d 1080 (Pa. 2018).  Child's legal counsel concurred with the guardian's assessment, and did not object to the court's vacating of her appointment.

Father filed this timely appeal. He presents the following questions, which we restate for clarity:

> 1. Whether the orphans' court erred by terminating Father's parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1)-(2), where Father presented evidence that he has remedied his situation by complying with his Single Case Plan objectives?
>
> 2. Whether the orphans' court erred in terminating Father's parental rights under 23 Pa.C.S.A. § 2511 (a)(2), where the evidence has been insufficient to establish Father caused child to be without essential parental care?
>
> 3. Whether the trial court erred by terminating Father's parental rights under 23 Pa.C.S.A. § 2511(b) where evidence was presented that established that Child had a bond with Father?

***See*** Father's Brief at 8.[3]

We adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result

---

[3] We observe that Father's Concise Statement and Questions Involved are not identical; but because the above issues are substantially similar, none has been waived. Additionally, we observe that Father evidently abandoned his claim that the court erred when it changed Child's goal from reunification to adoption. Although the issue was contained in his concise statement, it was not mentioned in his brief. Thus, that issue is not before us.

merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As [the Supreme Court] discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's termination of parental rights based on any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Sections 2511(a)(2) and (b) provide, in relevant part, as follows:

§ 2511. **Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Instantly, Father's first and second issues concern the first prong of the termination analysis, thus we address them simultaneously. The orphans'

court's determined that DHS met its burden under § 2511(a)(2), namely that Father was incapable of parenting.

The Supreme Court has addressed parental incapacity under § 2511(a)(2) as follows:

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (quoting *In re William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Turning to the instant matter, we first address the court's determination that DHS met its burdens under § 2511(a)(2), that Father's drug addiction rendered him incapable of parenting. The crux of Father's argument is that, although he tested positive for cocaine prior to the Child's adjudication, the only illicit drug he tested positive for thereafter was marijuana. *See* Father's Brief at 12. He further argues that DHS did not testify that his housing was

inappropriate, nor that he failed to complete his parenting class. ***Id.*** Finally, he contends that his visitation was consistent. ***Id.***

Father's arguments are disingenuous. Father did not merely consume marijuana on a few occasions while he otherwise diligently completed his single case plan's objectives.

After the court adjudicated the Child dependent in July 2016, Father did not attend another review hearing until May 2017, almost a year later. In fact, he refused to even acknowledge the Single Case Plan. Father totally refused to submit to random drug screens. He also refused to submit to a drug evaluation and treatment. ***See*** N.T., 9/19/18, at 51-52.

Even though Father knew Child was in placement, he avoided DHS. When he was finally located, he was living with his mother. But despite DHS' repeated attempts, Father refused to let DHS evaluate his home. Father claimed he was working, but never evidenced proof when DHS sought to accommodate his schedule.

In his brief, Father claims DHS failed to prove that he did not accomplish his parenting goal. He explains that DHS only elicited testimony that his parenting classes were incomplete when the caseworkers changed. ***See*** Father's Brief at 12; ***see also*** N.T. at 60-61. Regardless of whether Father finished the program, a completion certificate does not excuse his inability to provide negative drug screens or his inability to demonstrate stable housing. This case did not hinge solely on Father's participation in parenting classes.

In terms of his visitation goal, Father's initial inconsistent attendance caused the court to reduce his supervised visits from weekly to biweekly. **See** N.T. at 62. Father only attended them if Mother went. **Id.** This meant he did not come for months at a time. **Id.**

In reality, Father caused Child to go without parental care for the entirety of her life. Whether Father was incapable of parenting or whether he outright refused to parent, the result is the same. The orphans' court did not abuse its discretion when it concluded that DHS satisfied the first prong of the termination analysis.

Having concluded that the court properly applied the first prong of the termination analysis, we turn now to the second prong under section 2511(b). In Father's third and final appellate issue, he argues that because Child is bonded to him, the termination of the relationship does not best serve the Child's needs and welfare. **See** Father's Brief at 13-17.

This Court has stated that the initial focus of a termination analysis is on the parent, but the second prong focuses on the child. **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)],

> this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances…where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are also a relevant part of this analysis. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … [his] child is converted, upon the failure to fulfill … [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Instantly, two DHS caseworkers and two visitation coaches testified at the hearing. Father relies exclusively on the favorable testimony from the visitation coaches, while ignoring the DHS caseworkers' testimony entirely.

The first visitation coach assigned to Father's case was Richard Collins, who worked with the family between April 2016 and April 2017. Mr. Collins testified that he believed the bond between Father and Child was "one of my stronger bonds." N.T. at 166. Unlike the DHS Caseworkers, Mr. Collins testified that that Father's visits were very consistent. *Id.*

The second, and current, visitation coach was Raymond Nichols. He testified that Child was engaged with Father during the visits, and that Father knew Child "like the back of his hand." *Id.* at 188. In fact, the witness testified that he has never seen such preparation on the part of the parent:

> [The parents] set up the room before the child comes in. They know specifically what toys [Child] uses. They know what she eats. They know everything. Like their whole visit is set up like they have a time where their [sic] eating. They have a time where they're learning. They have a time when they're playing. They have a time when they're getting ready, when they're getting cleaned up, when they're ready to go. I've never done a visit where the parents already had everything that they were going to do planned out prior to even getting in the room.

*Id.* at 200.

Mr. Nichols also stated that the parents were asked to walk out with Child to the car after the visit, because Child was upset when the visits ended. *Id.* at 194. The witness concluded that Child would absolutely suffer irreparable harm if the relationship was severed. *Id.* at 188.

- 10 -

In its Rule 1925(a) opinion, the orphans' court did not address the visitation coaches' testimonies. However, the court explicitly noted that it afforded greater weight to the testimony of the DHS' caseworkers. We observe that the orphans' court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***In Interest of D.F.***, 165 A.3d 960, 966 (Pa. Super. 2017) (citation omitted).

There are ample reasons why the court afforded the visitation coaches' testimonies limited credence. Mr. Collins' recommendation was not well-reasoned. He testified that he did not consider illicit drug use to be a worthwhile reason to forbid unsupervised visitations. ***Id.*** at 183-184. On the other hand, Mr. Nichols did not seem to grasp the concept of irreparable harm. He testified: "Irreparable harm meaning not physical, but would it (*sic*) emotionally damage the child or would it – you know – sway her to do anything bad or anything like that." ***See id.*** at 189. Although Mr. Nichols had first-hand experience, having been a child whose own parents had their rights terminated, he had no formal education regarding social work, child development, or the like. His degree was in funeral directing. ***Id.*** at 190. Moreover, Mr. Nichols did not know who actually cared for Child, nor did he observe an interaction between the Child and the foster parent. As such, he testified that he could not give an opinion about their bond.

Meanwhile, the DHS caseworkers gave a largely contradictory account. Caseworker Nakeya Plunkett, who had the case first, testified that when

Father's visits ended, Child had no reaction. *See* N.T. at 67. She also testified that although Father behaved appropriately during the visits, he evidently did not grasp what was appropriate for Child. For instance, he brought a hula-hoop and jump rope for Child even though Child could hardly walk. *Id.* at 63. Caseworker Kenisha White, who took over for Caseworker Plunkett, testified that Child was standoffish and would often need time to warm up to Father during a visit. *Id.* at 122. She said the interactions were not close for the most part. *Id.*

Notwithstanding the competing accounts, the court was within its discretion when it ruled that DHS met the heightened burden when demonstrating that termination was in Child's best interests.

For one, the visitation coaches' assumptions about the parent-child bond were entirely superficial, and the court acted within its discretion to discount them. The coaches witnessed a happy toddler eat snacks and play with toys with an attentive adult; but it was the foster parent, not Father, who has raised Child.

To that end, the question is not whether Child and Father have a bond, but whether that bond is worth preserving. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citing In *re K.K.R.–S.*, 958 A.2d 529, 535–536 (Pa.Super.2008). The mere existence of an emotional bond

does not preclude the termination of parental rights. *Id.,* 93 A.3d at 897-898; *see also In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *Id.* at 898 (citation omitted).

Over the entire course of Child's short life, she has resided with the same foster parent, the only caregiver she has ever known. Caseworker White testified that Child is "well-bonded" to the foster parent, that it is evident that they care for each other, that it is the foster parent who attends to her daily needs. *Id.* at 121-122. The orphans' court was not swayed by the visitation coach's testimony that Father provided "essentials" for Child. *Id.* at 188. For instance, it is one thing to play with a toddler during a two-hour supervised visit, it is quite another to ensure that the child receives regular medical care. To that end, Father has only attended one of Child's doctor appointments. *Id.* at 122.

Child has never lived with Father, because Father's drug use necessarily rendered any potential living arrangement to be unsafe. Father's inability to achieve sobriety prevented him from affording Child necessary security and stability, which in turn prevented the creation of a worthwhile parental bond. And while Father may have appeared attentive and enjoyable during his visits, there is no question that only the foster parent provided Child those

intangibles essential for her proper development.  We conclude that the court did not abuse its discretion by ruling that DHS met its burden under the second prong of the termination analysis.  Father's final issue is without merit.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/30/19